E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
JEREMIAH LEVINE (Cal. Bar No. 288377)
SARA VARGAS (Cal. Bar No. 313370)
Assistant United States Attorneys
Violent & Organized Crime Section
      1300 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-2400
      Facsimile: (213) 894-3713
      E-mail:  Sara.Vargas@usdoj.gov
               Jeremiah.Levine@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 23-CR-331-DSF |
|---|---|
| Plaintiff, | GOVERNMENT'S TRIAL MEMORANDUM |
| v. | Trial Date: October 24, 2023 |
| | Trial Time: 8:30 a.m. |
| FEREIDOUN KHALILIAN, | Location:   Courtroom of the Hon. |
| aka "Prince Fred," | Dale S. Fischer |
| "Fred," | |
| Defendant. | |

      Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Sara Vargas and Jeremiah Levine, hereby submits its Trial Memorandum.

///

The government respectfully reserves the right to supplement its
Trial Memorandum as needed.

Dated: October 17, 2023          Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 MACK E. JENKINS
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                 ___ */s/ Jeremiah Levine*___
                                 JEREMIAH LEVINE
                                 SARA VARGAS
                                 Assistant United States Attorneys

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

<u>MEMORADUM OF POINTS AND AUTHORITIES</u>

**I.    STATUS OF THE CASE**

Jury trial is set for October 24, 2023, at 8:30 a.m.  The estimated time for the government's case-in-chief is three days. This estimate is subject to the time required for cross-examination by defendant.  The government anticipates calling seven witnesses:[1]

> (1)  Victim J.E. Government estimate: three hours. Defense cross-examination estimate: three hours.
>
> (2)  Witness M.S.  Government estimate: three hours. Defense cross-examination estimate: four hours.
>
> (3)  Witness from WhatsApp. Government estimate: thirty minutes. Defense cross-examination estimate: ten minutes.
>
> (4)  FBI Phone Extraction Technician Chris Nam.  Government estimate: one hour. Defense cross-examination estimate: one hour.
>
> (5)  FBI Special Agent Michael Fukuda.  Government estimate: two hours. Defense cross-examination estimate: two hours.
>
> (6)  Language Analyst Farideh Rahimis.  Government estimate: Ten minutes.  Defense cross-examination estimate: no estimate.
>
> (7)  Federal Bureau of Investigation ("FBI") Special Agent Ramel Moore.  Government estimate: two hours. Defense cross-examination estimate: one hour.

**II.   STATEMENT OF THE CHARGE**

Defendant is charged in the Indictment with Murder for Hire, in violation of 18 U.S.C. § 1958(a).  The Indictment was filed on July 5, 2023, at docket number five.

---

[1] The parties will attempt to stipulate regarding the authenticity of government exhibits.  Otherwise, the government will seek to introduce certain documents on the basis of certifications made pursuant to Federal Rule of Evidence 902(11).  If the Court finds that the certifications are insufficient, then the government will be required to call custodians of records to testify.

1

## III.  ELEMENTS OF THE OFFENSE

In order for a defendant to be guilty of violating Title 18, United States Code, Section 1958(a), the government must prove the following elements beyond a reasonable doubt:

    (1)  The defendant used a facility in interstate or foreign commerce;

    (2)  The defendant did so with the intent that murder be committed; and

    (3)  The defendant intended that the murder be committed in exchange for money.

*Source:  Ninth Circuit Model Criminal Jury Instruction No. 16.7 (2022 ed.)*

In order to satisfy the second element, the parties agree that defendant must have used the interstate commerce facility before he believed the murder was complete.  See <u>United States v. Driggers</u>, 559 F.3d 1021, 1023 (9th Cir. 2009).

## IV.  FACTUAL SUMMARY[2]

### A.  Defendant's Relationship with Victim J.E.

Defendant met the victim in the present case, J.E., in Miami in 2009 when J.E. fixed defendant's computer.  At the time, defendant held himself out as a wealthy businessman, and J.E. worked in a computer repair store.  Defendant hired J.E. to work in the IT department of defendant's company, My Car Solutions.  J.E. later departed the company and moved to Los Angeles to pursue a career as a documentary filmmaker.  J.E. and defendant were out of touch until they reunited by coincidence in 2019.

---

[2] The defense does not comment on the factual summary or other portions of this memorandum except the estimated cross-examination times.

2

After the 2019 re-acquaintance, J.E. decided to make a documentary film about what he perceived as defendant's life as a conman.  J.E. initially told defendant that the documentary would portray him positively, so defendant agreed to participate in making the documentary.  For example, J.E. interviewed defendant for the documentary for approximately four days.

Defendant believed that the documentary could be widely distributed.  This will be in evidence because defendant sent J.E. a voice memorandum discussing distribution possibilities, including to Netflix and HBO.  Defendant was therefore aware that the documentary could disseminate unfavorable information about him.  The documentary included allegations that defendant engaged in numerous frauds and shakedowns; faced repeated penalties from the Federal Trade Commission; repeatedly issued threats of murder and dismemberment; was accused of rape; was convicted of crimes; that defendant falsely claimed to be a prince; that defendant lied about his father rescuing American hostages in Iran and then being executed in the Iranian revolution; and other information. Defendant knew of these allegations because M.S. sent him a trailer of the documentary and J.E. played the trailer to him over the phone, in addition to playing portions of interviews conducted for the documentary.[3]  Defendant also addressed some of these allegations in his four-day, video-recorded interviews with J.E.

Defendant also believed that J.E. harassed him, his then-girlfriend, T.V., and his current girlfriend, A.A.  M.S. will

---

[3] M.S. is a former bodyguard for the defendant. Defendant hired M.S. to murder J.E.

3

testify that defendant complained about such harassment by J.E.
J.E. was, in fact, personally responsible for at least some of the
harassment that upset defendant.  During one short period in early
March 2023, J.E. called defendant approximately 20 times using
various spoofed[4] phone numbers.  Initially, J.E. prank called
defendant because J.E. was bored and wanted to annoy defendant, not
for the documentary, and consequently J.E. did not realize he was
recording them.  However, in response to one such harassing call on
March 8, 2023, defendant said the following to J.E.:

> What do you want, asshole? What do you want motherfucker? I'm
> gonna fuck you up, bitch. I'm gonna find out who you. [J.E.],
> [J.E.], I'm gonna have your fucking head. I'm gonna fuck you up
> so hard. J.E., J.E., you're a fucking piece of you shit you
> mother fuckin, cock sucking, mother fucker.

J.E.'s girlfriend, who was with J.E. when defendant made the above
threat and was shocked by defendant's language, asked J.E. whether
he had recorded the call.  J.E. then realized that he unwittingly
had recorded it.  J.E. called defendant again, recording for the
purpose of the documentary, and defendant again threatened severe
physical harm, saying:

> I'm going to fuck you up bitch. [J.E.] I'm going to have your
> fucking head.  I'm going to fuck you up so hard.  [J.E.],
> you're a fucking piece of shit, you motherfucking, cocksucking,
> motherfucker.  Listen to me you motherfucker.  When I'm done
> with you, I'm going to cut each one of your fucking fingers
> off.  I'm coming for you, motherfucker.  I was leaving you
> alone for a couple of years, you hear me you cocksucker? Say
> hello. Talk bitch.  [J.E.], listen to me.  I'm going to get
> you.  I'm going to cut your fucking dick off.  I'm going to
> stick it in your mouth while I fuck you in the ass, and then
> while I'm cutting your fingers off, I'm going to cum all over
> your face, you fucking, cocksucking, motherfucker.

---

[4] Spoofing is the act of using software to disguise one's phone
number and make it appear that one is calling from a different
number.

4

1

2  As provided in greater detail below, the government will seek

3 to admit these recordings at trial because defendant's threats to

4 hurt and kill J.E. are direct evidence of defendant's attempt to

5 have J.E. killed nine days later.

6  **B. The Murder Plot**

7  As stated above, the person defendant hired to kill J.E. is

8 witness M.S.  M.S. and defendant met when M.S. was working as

9 security for defendant's friend.  M.S. will testify that defendant

10 frequently complained about J.E.  Specifically, defendant complained

11 about the content of the documentary; that he was hurt by contacts

12 participating in the documentary; that he believed the documentary

13 was hurting his business interests, including with Native American

14 tribes; and that J.E. was hacking his online accounts.  Defendant

15 would even say that he wanted to kill J.E.  Defendant also admitted

16 to M.S. that he was not a prince, but continued pretending to be

17 one.

18  M.S. left defendant's full-time employ around May 2022.  The

19 two remained in periodic contact by phone.  About two hours after

20 J.E.'s March 8, 2023, spoofed phone calls to defendant that ended in

21 defendant's threat to dismember J.E., defendant sent M.S. a message

22 by WhatsApp that said, "call me please."  Defendant then had an

23 unrecorded voice call with M.S. in which defendant asked M.S. to

24 beat up J.E. and steal his documentary equipment.  M.S. agreed.

25  M.S. pretended to hire a team to surveille J.E., and defendant

26 also claimed to be surveilling J.E.  The men exchanged Whatsapp

27 messages about M.S.'s attempts to locate J.E. to commit defendant's

28

requested crimes, and defendant continually tried to coax J.E. out of his apartment to be confronted.

On or about March 16, 2023, defendant called M.S. by phone. During the call, defendant was enraged, claiming that J.E. had frozen his credit cards, and was providing drugs to defendant's son. Defendant also claimed that J.E. was interfering with his business. Defendant then said something like, "I'm going to walk up and shoot the fucker in the head, even if it's in public, I don't care. He has taken everything from me, I will take everything from him." Defendant said that if M.S. didn't kill J.E., defendant would kill J.E. himself.  Defendant told M.S. that if he killed J.E., defendant would pay him $20,000 and that M.S. would not have to worry financially for the rest of his life.

M.S. did not want J.E. to be killed and decided to give defendant the impression that he would hire people to murder J.E., but he would also secretly warn J.E. of defendant's plan.  M.S. told defendant that he had hired three men from Mexico who would murder J.E., although M.S. had not actually made any such arrangements. M.S. and defendant had this exchange by WhatsApp:

> Defendant:    I need this done ✓
>
> M.S.:         Already booked.  Not leavin ya hanging. I got it
>               I'll be there personally …. I'm [*sic*] want to
>               pay them 1,000 each, these are Mexicans.  There
>               is [*sic*] three of them."

M.S. also provided a hotel confirmation for Courtyard Los Angeles for March 17-19, 2023, suggesting that that is where M.S. would stay while in Los Angeles to murder J.E.

### C.   The Staged Murder and Initial Murder Payments

M.S. tried to get in touch with J.E. the same evening he learned of defendant's plans to have J.E. murdered.  M.S. and J.E. finally spoke with J.E. on the morning of March 17, 2023, when M.S. called J.E. to warn him that defendant offered to pay M.S. to have J.E. killed.  J.E. and M.S. discussed staging a fake death scene to fool defendant into believing that J.E. had been murdered.

Just after noon that day, M.S. texted defendant, "You'll have proof of everything by 6pm my time tomorrow night.  Enjoy your time. I got you.  Lmk about the deposit thing, when you can."

Later that day, J.E. staged a murder scene.  J.E.'s girlfriend photographed it.  Meanwhile, M.S. told defendant that M.S. had been viewing the murder carried out via FaceTime.  Defendant wanted to know the details of how J.E. was killed and was especially intrigued by what J.E.'s last words were and whether he had apologized to defendant.  M.S. said J.E. was stabbed in the neck and was gurgling on his blood as he died so M.S. could not make out most what J.E. was trying to say.

M.S. texted defendant a photo of the staged murder scene and other similar ones, explaining, "I have 67 photos and a video."  In the same minute, 3:39 p.m., defendant's CashApp account called $PrinceFredKhalifa sent M.S. $3,000 with the note, "for my guys." This is the same amount defendant had agreed on the day earlier, in preserved WhatsApp messages.  Six hours later, at 9:31 p.m., the same account sent M.S. another $3,500.  A subpoena response from CashApp confirmed that defendant is the subscriber of that CashApp account.

1          **D.   M.S. Begins Cooperating with the FBI**

2          On March 21, 2023, J.E. reported defendant's murder-for-hire

3    scheme to the FBI Los Angeles Office.  Beginning March 22, 2023,

4    M.S. conducted a series of phone calls to defendant under the

5    direction of FBI agents.  These phone calls were monitored and

6    recorded by FBI agents who were with M.S. during the calls.

7          In the first recorded call, on March 22, 2023, defendant and

8    M.S. confirmed a working Zelle account for M.S.  The next day, on

9    March 23, beginning at 10:27 a.m., they had this conversation:

10         M.S.:          Hey, uh, those guys, the ones we sent that first

11                        payment to for [J.E.'s] you know, [J.E.]'s

12                        thing?  The ones that took out [J.E.]

13         Defendant:     Yeah, the first one

14         M.S.:          Basically, so they got rid of his body, you know

15                        the ones that killed him, they basically are

16                        asking for another thousand, so I'm wondering if

17                        you would, that account for right now, the one

18                        that I sent you, can you use…

19         Defendant:     No problem.

20         M.S.:          Can you send me uh…

21         Defendant:     Do it through CashApp or through Zelle?

22         M.S.:          If you could Zelle the account I sent yesterday,

23                        I'm just going to take it out of the business

24                        account so it doesn't look weird, and I'm going

25                        to give it to them so we can just be done with

26                        them.

27         Defendant:     How much do you want me to send?

28

1     M.S.:           If you could just send them a thousand each.

2                             There's only three of them.

3     Defendant:    Okay, I'll send it right now. No problem.

4     M.S.:           Okay, thank you.

5     At approximately 10:30 a.m. that day, just three minutes after

6 the call began, M.S.'s Zelle account received a deposit of $4000.

7     At 11:18 a.m. that day, the men shared this call:

8     Defendant:    My brother, everything okay?

9     M.S.:           Yeah, everything's good, I just wanted to let

10                             you know I got it and I've already sent it off

11                             to them.  I just gave them $1250 each.

12     Defendant:    Thank you, thank you, sir.  His body, nobody is

13                             going to be able to find him, huh?

14     M.S.:           No, no one's going to be able to find him.

15     Defendant:    Alright, cool.

16     M.S.:           They actually asked if you wanted a souvenir.

17     Defendant:    Yes.  No, no I don't.

18     M.S.:           I told them I'd ask but that's about it.

19     Defendant:    Yeah, they like to cut heads and fingers and

20                             shit.

21     **E.    Defendant and M.S. Discuss Defendant's Next Murder-for-**

22           **Hire Target**

23     After defendant believed J.E. was dead, defendant asked M.S. to

24 direct his focus on other people defendant believed were harassing

25 him.  He believed two of these men went by the monikers "m2k" and

26 "Ayko."  In recorded communications, defendant said he wanted M.S.

27 to continue pursuing Ayko and m2k.  Defendant told M.S. that he

28

heard m2k is "shitting himself" after learning that J.E. had been killed.  Harkening back to J.E.'s supposed murder, defendant said of m2k's impending murder, "one down, one to go."

**F.    Defendant Reaffirms that He Wanted J.E. Dead**

In late June, defendant told M.S. that he was flying to Las Vegas and asked M.S. to pick him up at the airport, which M.S. did while wearing an FBI-monitored recording device.  When the men discussed J.E., defendant volunteered:

> I was going to kill him myself.  I bought a gun, I was coming to LA.  You saved me from myself.  I was going to kill him.  I was going to stand outside of his place till he comes out.  I was going to fucking shoot him in his fucking head.

After that statement, FBI agents arrested defendant on the outstanding arrest warrant and also seized his digital devices pursuant to a search warrant.

**G.    Defendant Attempts to Bribe M.S. to Lie at Trial**

Defendant is detained pending trial.  On August 17 and 18, 2023, defendant used other inmates' phone accounts to make outbound calls from custody.  On August 17, 2023, defendant directed his nephew to contact another former bodyguard named Tyson James ("James").  On August 18, defendant called James directly.

In the following days, James contacted M.S.  James called again and offered M.S. money to withdraw his statement that Khalilian hired M.S. to murder J.E.  M.S. alerted the FBI.  In later calls, James confirmed that the request for M.S. to change his testimony came "from Fred," which is Khalilian's nickname.  In another phone

call, James told M.S. that "Fred" was the person who wanted to pay M.S. $400,000.

James also connected M.S. with defendant's brother and nephew, who also wanted M.S. to "tell the truth" in exchange for hundreds of thousands of dollars and the promise that he and his family would be "taken care of" for the rest of their lives.  They also suggested an in-person meeting to discuss the bargain they proposed.

To maximize safety and minimize M.S.'s exposure to potential danger, FBI requested that M.S. not meet with James and others in person.  Instead, the FBI requested that M.S. introduce James and the others to a person M.S. would claim was his friend, but who was actually and undercover law enforcement officer (the "UC") working to investigate the witness tampering.  The UC then had a recorded telephone call with James, M.S., Khalilian's nephew, and Khalilian's brother.  On that call, they again requested M.S. change his story, offering to pay him money to "tell the truth."

In September 2023, the UC contacted Khalilian's brother numerous times to arrange for the meeting that they had previously requested, but no meeting took place.

On or about October 9, 2023, James called M.S.  On that call, which was not recorded, James asked M.S. to borrow money, which M.S. declined to do.  James then spontaneously sent to M.S. a voice memo recording of defendant.  In that voice memo, defendant expressed his extreme gratitude for helping him out with his case and reassured James that he would be handsomely rewarded for his help in getting him out of prison.

**V.     LEGAL AND EVIDENTIARY ISSUES**

    **A.   Defendant May Not Introduce his Own Statements**

       While the government may present evidence of defendant's statements as admissions of a party opponent, defendant may not introduce non-inculpatory statements, including from a government recording.  See United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000) (non-self-inculpatory statements, even if made contemporaneously with other self-inculpatory statements, are inadmissible hearsay).  To permit otherwise would place a defendant's statements "before the jury without subjecting himself to cross-examination, precisely what the hearsay rule forbids."  Id. at 682.

       The rule of completeness also does not entitle a defendant to elicit his own inadmissible hearsay statements.  See United States v. Collicott, 92 F.3d 973, 983 (9th Cir. 1996) (holding that Fed. R. Evid. 106 does not compel admission of otherwise inadmissible hearsay evidence).  Thus, if the government plays only a portion of a recording in this case, defendant has no right to introduce the remainder of the recording for this own benefit.  The "rule of completeness" set forth in Federal Rule of Evidence 106 applies to prevent one party from introducing a tailored snippet of a statement that unfairly misleads the jury.  It is entirely proper, however, to admit segments of a statement without including everything, and adverse parties are not entitled to offer additional statements just because they exist and the proponent has not offered them.  Id.

       Moreover, a defendant cannot rely upon Rule 801(d)(1)(B) (concerning prior consistent statements) as an alternative basis for

the admissibility of such testimony.  A prior consistent statement is not admissible if it is introduced in the absence of impeachment. See United States v. Navarro-Varelas, 541 F.2d 1331, 1334 (9th Cir. 1976).  "The Rules do not accord this weighty, nonhearsay status to all prior consistent statements.  To the contrary, admissibility under the Rules is confined to those statements offered to rebut a charge of 'recent fabrication or improper influence or motive." Tome v. United States, 513 U.S. 150, 157 (1995) (citation omitted) (discussing Fed. R. Evid. 801(d)(1)(B)) (excluding consistent statements where the declarant made them after the incentive to fabricate arose).  The "significance of the requirement" is that "the consistent statements must have been made before the alleged influence, or motive to fabricate, arose."  Id. at 158; see also Breneman v. Kennecott Corp., 799 F.2d 470, 473 (9th Cir. 1986) ("A prior consistent statement is admissible only if it was made before the witness had a motive to fabricate.").

Defendant is not precluded from introducing evidence necessary to put on his defense, but he must do so by testifying or otherwise introducing witnesses.  Defendant is not permitted to place any of his prior statements before the Court or jury without subjecting himself to cross-examination. See Ortega, 203 F.3d at 682.  Thus, defendant may not introduce his prior statements through defense witnesses (other than defendant himself) or by cross-examining government witnesses with defendant's hearsay statements.

If the defendant testifies at trial, the government may also seek to impeach him with his prior convictions.  FRE 608(b).

**B.    Authentication, Identification, and Chain of Custody**

Fed. R. Evid. 901(a) provides that "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(a) only requires the government to make a prima facie showing of authenticity or identification "so that a reasonable juror could find in favor of authenticity or identification." United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991); United States v. Blackwood, 878 F.2d 1200, 1202 (9th Cir. 1989); United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985).  Once the government meets this burden, "the credibility or probative force of the evidence offered is, ultimately, an issue for the jury." Black, 767 F.2d at 1342.

**C.    Photographs and Audio/Video Recordings**

At trial, the government intends to introduce photographs, for example, those that victim J.E. sent hitman M.S. apparently depicting J.E.'s murder; audio clips, for example, those that victim J.E. recorded of phone calls with defendant; and video clips, for example, a recording that defendant posted to social media in which defendant complains about victim J.E.'s documentary.

Photographs are generally admissible as evidence.  United States v. Stearns, 550 F.2d 1167, 1171 (9th Cir. 1977) (photographs of crime scene admissible).  Photographs should be admitted so long as they fairly and accurately represent the event or object in question.  United States v. Oaxaca, 569 F.2d 518, 525 (9th Cir. 1978).  The Ninth Circuit has held that "[p]hotographs are

admissible as substantive as well as illustrative evidence." United States v. May, 622 F.2d 1000, 1007 (9th Cir. 1980).

"Photographs" include video recordings. Fed. R. Evid. 1001(2). Moreover, the Ninth Circuit has held that recordings are sufficiently authenticated under Federal Rule of Evidence 901(a) if sufficient proof has been introduced "so that a reasonable juror could find in favor of authenticity or identification," which can be done by "proving a connection between the evidence and the party against whom the evidence is admitted" and can be done by both direct and circumstantial evidence. United States v. Matta-Ballesteros, 71 F.3d 754, 768 (9th Cir. 1995), modified by 98 F.3d 1100 (9th Cir. 1996).

To assist the jury with some recordings which might be difficult to hear, the government will also present the recordings with synchronized transcripts so that when the recordings are played, the transcripts will appear on the computer screen for the jury to follow along and hear the entire conversation.  The government will produce transcripts for the recording to defense counsel prior to trial.

"[T]he use of transcripts contemporaneously with the playing of sound recordings often eliminates the necessity of replaying the recordings many times," which will save the Court's time and prevent any undue prejudice to defendant of having to replay the recordings. United States v. Turner, 528 F.2d 143, 167 (9th Cir. 1975); see also United States v. Mapuatuli, 762 F. App'x 419, 422 (9th Cir. 2019) (unreported) ("'[A]ccurate typewritten transcripts of sound recordings, used contemporaneously with the introduction of the

recordings into evidence ... [may be used] to assist the jury in following the recordings while they are being played.'") (quoting Turner, 528 F.2d at 167).

### D.   Business Records

The government intends to introduce records from T-Mobile and WhatsApp regarding defendant's association with certain phone numbers; and from CashApp and Zelle regarding defendant's association with certain accounts.  The government intends to establish the authenticity of these materials through signed declarations, which meet the requirements of Fed. R. Evid. 902(11). That rule identifies certain categories of documents which are self-authenticating, including:

The original or a duplicate of a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written declaration of its custodian or other qualified person, in a manner complying with any Act of Congress or rule prescribed by the Supreme Court pursuant to statutory authority, certifying that the record--

(A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

(B) was kept in the course of the regularly conducted activity; and

(C) was made by the regularly conducted activity as a regular practice.

The underlying documents and declarations have been provided to defense counsel.

### E.    Expert Testimony

The government has provided notice that it intends to offer testimony from two experts to assist the trier of fact in resolving disputed factual questions at trial in the instant matter. Specifically, the government intends to call FBI Phone Extraction Technician Chris Nam, who will testify about his extraction of data from defendant's phones,[5] and Farsi Language Analyst Farideh Rahimis, who will testify as to the truth and accuracy of her Farsi translations.

Admission of expert testimony is generally a matter within the broad discretion of the trial judge; it will not be disturbed unless it is manifestly erroneous.  United States v. Cuevas, 847 F.2d 1417, 1428 (9th Cir. 1988); United States v. Kinsey, 843 F.2d 383, 388 (9th Cir. 1988) (overruled on other grounds); United States v. Fleishman, 684 F.2d 1329, 1335 (9th Cir. 1982) (overruled on other grounds).  If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a qualified expert witness may provide opinion testimony on the issue in question.  Fed. R. Evid. 702.  An expert's opinion may be based on hearsay or facts not in evidence, when the facts or data relied upon are of the type reasonably relied upon by experts in the field. Fed. R. Evid. 703.  An expert's opinion may embrace an ultimate issue to be decided by the trier of fact, as long as this issue does

---

[5] On October 15 or 16, 2023, the FBI for the first time was able to open defendant's laptop, for which the government has a search warrant.  Mr. Nam is imaging and extracting data from the laptop. The government expects to notice Mr. Nam as an expert to testify about that process as well.

1    not pertain to the ultimate question of defendant's mental state.

2    Fed. R. Evid. 704; <u>Fleishman</u>, 684 F.2d at 1335.

3        **F.   Character Evidence**

4        To the extent that the defendant seeks to call character

5    witnesses, such evidence may be excluded.  The Supreme Court has

6    recognized that character evidence -- particularly cumulative

7    character evidence -- has weak probative value and great potential

8    to confuse the issues and prejudice the jury.  <u>See</u> <u>Michelson v.</u>

9    <u>United States</u>, 335 U.S. 469, 480 (1948).  The Court thus has wide

10   discretion to limit the presentation of character evidence.  <u>Id</u>.

11       In addition, the form of the proffered evidence must be proper.

12   Rule 405(a) sets forth the sole methods for which character evidence

13   may be introduced: testimony as to reputation, or opinion.  A

14   defendant may not introduce specific instances of his good conduct

15   through the testimony of others.  <u>See</u> <u>Michelson</u>, 335 U.S. at 477.

16       On cross-examination of a defendant's character witness,

17   however, the government may inquire into specific instances of a

18   defendant's past conduct relevant to the character trait at

19   issue.  <u>See</u> Fed. R. Evid. 405(a).  In particular, a defendant's

20   character witnesses may be cross-examined about their knowledge of

21   the defendant's past crimes and wrongful acts.  <u>See</u> <u>Michelson</u>, 335

22   U.S. at 481.  The only prerequisite is that there must be a good

23   faith basis that the incidents inquired about are relevant to the

24   character trait at issue.  <u>See</u> <u>United States v. McCollom</u>, 664 F.2d

25   56, 58 (5th Cir. 1981).  If the defense offers character evidence

26   regarding defendant in this case, the government may offer character

27   evidence in rebuttal.

28

### G.   J.E.'s Mental Health History is Irrelevant

J.E. is the victim in this case.  Defendant intends to question J.E. about his mental health and mental health history.  Defendant's purpose, as the government understood it during an October 16, 2023, meet-and-confer, is to suggest that defendant had a mental health problem which caused him to imagine that defendant was out to get him, and consequently to fabricate defendant's plot to murder him. Pursuant to the Court's order from the bench on October 16, 2023, the parties will brief the matter this week.  In preview, the government believes that such evidence is inadmissible because tarring the victim with the stigma of mental health difficulties violates Rule 403's prohibition cumulative and unduly prejudicial evidence.  The defense has offered no reason to believe that defendant any mental illness J.E. made him deluded about defendant; that it gave J.E. the willingness or ability to fabricate defendant's murder for hire scheme; or even that his history of mental illness affected him during the time period of defendant's crime, March 2023.

### H.   No Jury Nullification

The Court should exclude any evidence and/or argument relating to or concerning any possible jury nullification defense.  This includes any evidence and/or argument meant to play on the jury's sympathy for defendant.

It is well established that a defendant does not have a right to a jury nullification instruction.  United States v. Powell, 955 F.2d 1206, 1213 (9th Cir. 1992).  Having no right to seek jury nullification, a defendant has no right to present evidence relevant

19

only to such a defense.  Zal v. Steppe, 968 F.2d 924, 930 (9th Cir. 1992) (Trott, J., concurring) ("[N]either a defendant nor his attorney has a right to present to a jury evidence that is irrelevant to a legal defense to, or an element of, the crime charged.  Verdicts must be based on the law and the evidence, not on jury nullification as urged by either litigant."  (emphases in original)).

Since they do not make any fact in issue more or less probable, evidence and arguments meant to play on the jury's sympathy are not relevant under Federal Rule of Evidence 401 and must be excluded on that basis.  In addition, appeals to sympathy are unduly prejudicial and confusing to the jury and misleading under Rule 403 and, therefore, properly excluded on that basis even if they had some arguable relevance.

The government anticipates that the defense may seek jury nullification disguised as witness impeachment.  For example, the defense is likely to seek to introduce evidence that J.E. access defendant's bank accounts without defendant's permission by impersonating defendant on the phone.  The defense may claim that such impersonation makes it more likely to J.E. fraudulently concocted the recorded phone calls of defendant threatening him.  That stretches reason too far.  In fact, evidence that J.E. accessed defendant's bank account without defendant's permission would only inflame the jury against J.E. such that they could be moved to indifference about the murder for hire.  Nor is this evidence relevant to the question of whether defendant committed the charged crime: whether J.E. accessed the defendant's bank accounts does not

make any of the elements of the crime any more or less probable. Defendant's calls and phone messages prove the federal nexus, and M.S.'s testimony and recordings of defendant prove that defendant intended to pay M.S. to kill J.E. in exchange for money.  J.E.'s character is not a fact in issue.

### I.   Defendant's Threats to Murder J.E. are Inextricably Intertwined with the Murder-for-Hire of J.E.

As detailed above, defendant threatened to murder victim J.E.[6] by phone on March 8, 2023, just nine days before actually hiring M.S. to murder J.E.  Defendant's threats were part of the same criminal transaction as the charged crime and were therefore inextricably intertwined with it, and are also context necessary to rebut defendant's defense.  Alternatively, the threats were admissible under Federal Rule of Evidence 404(b) to show defendant's identity, intent, and plan.

Evidence that is "inextricably intertwined" with charged crimes is admissible to prove the alleged conduct.  Such evidence is admissible without reference to Rule 404(b).  See United States v. Soliman, 813 F.2d 277, 279 (9th Cir. 1987) ("Evidence should not be treated as 'other crimes' evidence when 'the evidence concerning the other act and the evidence concerning the crime are inextricably intertwined'") (citations omitted); see also United States v.

---

[6] Defendant said, in part, "I'm going to have your fucking head . . . .  I'm going to cut your fucking dick off.  I'm going to stick it in your mouth . . . ."

21

1  Anderson, 741 F.3d 938, 949 (9th Cir. 2013) ("Rule 404(b) does not
2  apply when offenses committed as part of a single criminal episode
3  become other acts simply because the defendant is indicted for less
4  than all of his actions.")

5      Two categories of other act evidence may be "inextricably
6  intertwined" with a charged crime.  United States v. Vizcarra-
7  Martinez, 66 F.3d 1006, 1012 (9th Cir. 1995).  First, other act
8  evidence may "constitute[ ] a part of the transaction that serves as
9  the basis for the criminal charge."  Id.  Second, admission of other
10 act evidence may be admitted" to "put [defendant's] illegal conduct
11 into context and to rebut his [defense].").  United States v. Daly,
12 974 F.2d 1215, 1217 (9th Cir. 1992).  Such evidence is considered
13 "direct evidence, used to flesh out the circumstances surrounding
14 the crime with which the defendant has been charged, thereby
15 allowing the jury to make sense of the testimony in its proper
16 context."  United States v. Ramirez-Jiminez, 967 F.2d 1321, 1327
17 (9th Cir. 1992).[7]

18     In this case, the threat evidence is part of the same
19 transaction as the charged crime because defendant got angry at
20 victim J.E., threatened that J.E. would suffer harm, and then nine
21 days later, tried to fulfill that threat.  Moreover, in pretrial
22 litigation, defendant claims that he hired M.S. merely to beat, and
23 not murder, victim J.E.  The evidence of defendant's threats to

24

25 [7] United States v. Williford, 764 F.2d 1493, 1499 (11th Cir. 1985)
26 ("Evidence, not part of the crime charged but pertaining to the
   chain of events explaining the context, motive and set-up of the
27 crime, is properly admitted if linked in time and circumstances with
   the charged crime, or forms an integral and natural part of an
28 account of the crime, or is necessary to complete the story of the
   crime for the jury.").

dismember J.E. in ways that would have led to his death rebut that defense.

Even if the Court finds that the threat evidence is not inextricably intertwined, the Court should admit the evidence under Rule 404(b).  Evidence is admissible under that rule if it proves motive, intent, identity, or plan, and (1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; and (3) the evidence is sufficient to support a finding that the defendant committed the other act.  See United States v. Bailey, 696 F.3d 794, 799 (9th Cir. 2012); United States v. Vo, 413 F.3d 1010, 1018 (9th Cir. 2005).  Defendant's threats to harm victim J.E. indicated his plan and intent to do so.  Defendant's plan and intent are material to proving his guilt; the threats were not remote in time because they were just days before the crime, which defendant committed only seven months ago; and the evidence that defendant made the threats is strong because there is audio recording of him making them.

"Once it has been established that the evidence offered serves one of the [404(b)] purposes, the . . . 'only' conditions justifying the exclusion of the evidence are those described in [Federal] Rule [of Evidence] 403: unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence."  United States v. Curtin, 489 F.3d 935, 944 (9th Cir. 2007).  Here, the prejudice is fair because it arises directly from the probative value of the threats.  That is, the threats indicate defendant's identity, plan, and intent, and that is the sole reason they are prejudicial.  There is nothing else

prejudicial about them except that they are lewd.  United States v. Bailleaux, 685 F.2d 1105, 1111, n.2 (9th Cir. 1982) abrogated on other grounds by Huddleston, 485 U.S. at 685 (evidence is only unfairly prejudicial when it "not only has a significant impact on the defendant's case" but "results in some unfairness to the defendant because of its non-probative aspect" (emphasis added); United States v. Cruz-Garcia, 344 F.3d 951, 956 (9th Cir. 2003) ("That evidence may decimate an opponent's case is no ground for its exclusion under" Rule 403, which "excludes only evidence where the prejudice is 'unfair' - that is, based on something other than its persuasive weight.").

### J.   Summary Charts are Admissible

Federal Rule of Evidence 1006 provides as follows:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court.  The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place.  And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006.

The Advisory Committee Notes to Rule 1006 add that "[t]he admission of summaries of voluminous books, records, or documents offers the only practicable means of making their contents available to judge and jury.  The rule recognizes this practice, with appropriate safeguards."  Fed. R. Evid. 1006, 1972 Advisory Committee Notes; see also United States v. Johnson, 594 F.2d 1253, 1255 (9th Cir. 1979) ("The purpose of Rule 1006 is to allow the use

of summaries when the volume of documents being summarized is so large as to make their use impractical or impossible; summaries may also prove more meaningful to the judge and jury.").

A summary chart may be admitted as substantive evidence when the proponent establishes that the underlying documents upon which the summary is based are voluminous, admissible, and available for inspection. See Fed. R. Evid 1006; Johnson, 594 F.2d at 1256; United States v. Rizk, 660 F.3d 1125, 1130 (9th Cir. 2011). Although the materials underlying the summary chart must be admissible, the materials need not themselves be admitted into evidence. Rizk, 660 F.3d at 1130-31. In addition, the summary chart must be accurate, authentic, and properly introduced. United States v. Scales, 594 F.2d 558, 563 (6th Cir. 1979) (affirming introduction of summary charts presenting an organization of undisputed objective evidence in terms of relevant counts of the indictment). Any contention that the chart may contain inaccuracies or omissions goes to the weight of the evidence, not its admissibility. Rizk, 660 F.3d at 1131 n.2.

There is no requirement in Rule 1006 that it be literally impossible to examine the underlying records before a summary or a chart may be utilized. "All that is required for the rule to apply is that the underlying writings be 'voluminous' and that in-court examination not be convenient." Scales, 594 F.2d at 562. Nor does the large size of a summary chart render it inadmissible when it contains otherwise unobjectionable objective evidence. Id. at 563. Where a chart does not contain complicated calculations that would require an expert for accuracy, authentication of the chart

requires only that the witness (1) have properly catalogued the exhibits and records upon which the chart is based; and (2) have knowledge of the analysis of the records referred to in the chart.  Id.; see Goldberg v. United States, 789 F.2d 1341, 1343 (9th Cir. 1986) (upholding district court's determination that the testimony of a revenue agent as to summaries of voluminous tax records did not include any expert opinions or conclusions); United States v. Pree, 408 F.3d 855, 869 (7th Cir. 2005) ("When a summary witness simply testifies as to what the Government's evidence shows, he does not testify as an expert witness.").  The use of other persons in the preparation of summary evidence goes to the weight of the evidence, not its admissibility.  See United States v. Soulard, 730 F.2d 1292, 1299 (9th Cir. 1984).

In this case, Special Agent Moore is expected to testify, in part, about his investigation into the digital devices seized from the defendant upon his arrest, the content of those devices, and the accounts (both on and off those devices) defendant used during and in relation to the charged crime.  As Agent Moore will explain to the jury, the defendant used three different cell phone numbers on two different cell, phones, and, in turn, used those phone numbers to create and use accounts on WhatsApp, CashApp, and Zelle — all web-based applications.  Agent Moore will provide summary testimony about those accounts and will testify concerning their significance to the investigation, including that the defendant used those accounts to communicate with M.S. about the murder-for hire.

The proposed testimony and summary charts of Agent Moore fall squarely within the ambit of Rule 1006.  First, the records are

1   voluminous.  Defendant's CashApp, Zelle, WhatsApp, and subscriber

2   records are many large, separate files, some of which are not in an

3   easily readable format, such as Excel.  Second, the underlying

4   documents are admissible, and — although not required, <u>see</u> <u>Rizk</u>, 660

5   F.3d at 1130-31 — the government may seek to admit at least some of

6   the documents.  All records come with custodian of records

7   declarations that have been produced to the defense.  Third, the

8   underlying documents were produced to defendants in

9   discovery.  Fourth, the charts are accurate and authentic, and will

10  be properly introduced.  <u>Scales</u>, 594 F.2d at 563.  Defendants will

11  be free to cross-examine Agent Moore regarding any claimed

12  inaccuracies.  Fifth, it is clear that Agent Moore's testimony,

13  aided by his charts, will assist the jury in their deliberations to

14  understand defendant's use of digital devices and web-based

15  applications to commit the crime alleged in the Indictment.  The

16  summary charts present data about digital devices and web-based

17  applications in an easily comprehensible format, and then summarized

18  in separate charts.  These charts help to prove the murder-for-hire.

19      And sixth, it is important to note that Agent Moore will not

20  render opinions that the claims data or the other documents at issue

21  are indicative of any sort of criminal propensity.  Instead, Agent

22  Moore will simply testify about the factual information contained in

23  the records.  As a summary witness, Special Agent Moore is entitled

24  to "draw conclusions from the evidence presented at trial" and to

25  "testif[y] as to what the government's evidence shows," and merely

26  doing so does not convert him into an expert witness.  <u>Pree</u>, 408

27  F.3d at 869; <u>Scales</u>, 594 F.2d at 563.

28

K.    **Reciprocal Discovery**

Rule 16 of the Federal Rules of Criminal Procedure creates certain reciprocal discovery obligations on the part of defendant to produce three categories of materials that he intends to introduce as evidence at trial: (1) documents and tangible objects; (2) reports of any examinations or tests; and (3) expert witness disclosure.  Rule 16 imposes on defendant a continuing duty to disclose these categories of materials.  Fed. R. Crim. P. 16(b)(1)(A), (b)(1)(C), and (c).  In those circumstances where a party fails to produce discovery as required by Rule 16, the rule empowers the district court to "prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances."  The Ninth Circuit has held that where a defendant fails to produce reciprocal discovery, it is well within the district court's discretion to exclude such defense evidence, especially where the defense disclosure was made after the start of trial.  See United States v. Aceves-Rosales, 832 F.2d 1155, 1156-57 (9th Cir. 1987); United States v. Scholl, 166 F.3d 964, 972 (9th Cir. 1999); United States v. Nash, 115 F.3d 1431, 1439-40 (9th Cir. 1997).

The government has repeatedly requested such discovery in writing and by phone.  To date, defendant has not produced discovery to the government.  To the extent defendant attempts to introduce or use any documents at trial that he has not produced, or seeks to rely on an undisclosed affirmative defense, the government reserves the right to object and to request that the Court exclude defendant's undisclosed documents or affirmative defense(s).

**VI.   CONCLUSION**

The government respectfully requests leave to file such supplemental memoranda as may become necessary during trial.