CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
Jonathan C. Aminoff (Bar No. 259290)
(E-Mail:  Jonathan_Aminoff@fd.org)
Adam Olin (Bar No. 298380)
(E-Mail:  Adam_Olin@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081

Attorneys for Defendant
FEREIDOUN KHALILIAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. 2:23-CR-331-DSF |
|---|---|
| Plaintiff, | **OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT EVIDENCE ON WITNESS TAMPERING [ECF NO. 103] & MEMORANDUM OF LAW RE: MENTAL HEALTH EVIDENCE** |
| v. | |
| FEREIDOUN KHALILIAN, | |
| Defendant. | |

# MEMORANDUM OF POINTS AND AUTHORITIES[1]

## A.    The Court Should Exclude Any Call Not Placed by Mr. Khalilian

### 1.    Introduction

In its October 13, 2023 motion, the government alleges that Mr. Khalilian was directing an effort to pay M.S. to change his testimony at trial.  In support of this theory, the government has provided a two recorded telephone calls of Mr. Khalilian calling his nephew Shawn Khalilian on August 17 and 18, 2023.  In these calls, Mr. Khalilian asks Shawn Khalilian and Shawn's girlfriend Pegah to contact "Chef Ali" and former bodyguard Tyson James.  The next day, Mr. Khalilian called Shawn Khalilian again and Shawn Khalilian called Tyson James and allowed Mr. Khalilian and Mr. James to speak.  Mr. James stated that he would speak to M.S.  Mr. Khalilian did not instruct Mr. James, Shawn Khalilian, Pegah, or Chef Ali to make any payments to M.S.

The government proposes to admit evidence in its case-in-chief regarding alleged witness tampering.  Specifically, the government proposes to admit: (1) testimony from an FBI agent about the so-called witness tampering investigation; (2) testimony about Mr. James's telephone calls with M.S.; (3) testimony about Shawn Khalilian's phone calls with M.S.; (4) Testimony about Robert Khalilian's phone call with M.S.; and, (5) Mr. Khalilian's recorded phone calls from jail to Shawn Khalilian and a recorded voice memorandum sent to Mr. James.

### 2.    Any call in which Mr. Khalilian is not a party is inadmissible.

The government intends to admit recorded telephone calls for the purpose of establishing that Mr. Khalilian attempted to tamper with a witness which the government believes is admissible to show consciousness of guilt.  Specifically, the government claims that "defendant used his contacts to offer to pay M.S. hundreds of thousands of dollars to recant his expected testimony and testify on defendant's

---

[1] At the October 16, 2023 status conference, the Court directed Mr. Khalilian to file a response to the government's motion to admit evidence relating to witness tampering and a statement regarding what mental health evidence Mr. Khalilian intends to use at trial. For the sake of efficiency, Mr. Khalilian files those briefs together here.

1  behalf."  Dkt. 103 at 11:8-10.  The government intends to prove this by having M.S.

2  testify to statements allegedly made by Shawn Khalilian, Robert Khalilian, and Tyson

3  James.

4        To the extent that M.S. is going to testify as to the statements made by Shawn

5  Khalilian, Robert Khalilian, and Mr. James, the defense objects to their admission as

6  hearsay.  Fed. R. Evid. 801(c).  To the extent M.S. will testify that these witnesses

7  conveyed statements allegedly made by Mr. Khalilian, *see e.g.* dkt. 103 at 7:1-4

8  ("James again contacted M.S. and related defendant's message that defendant wanted

9  to pay $400,000 to M.S. to change his testimony so the murder-for-hire case would be

10  dismissed."), this is hearsay within hearsay.  *See United States v. Arteaga*, 117 F.3d

11  388, 396 n.12 (9th Cir. 1997) (explaining that when a statement contains "hearsay

12  within hearsay," "each statement must qualify under some exemption or exception to

13  the hearsay rule"); Fed. R. Evid. 805.

14        Although the government seemed to take the position in Court on October 16,

15  2023, that the statements would be offered for the non-hearsay purpose of their effect

16  on the listener, that explanation rings hollow.  Breaking down the government's

17  argument: the government proposes to offer M.S.'s testimony that Mr. James called

18  M.S. and said that Mr. Khalilian wanted to offer M.S. money to change his testimony.

19  This statement is only relevant if offered for the purpose of establishing that Mr.

20  Khalilian did in fact tell Mr. James to tell M.S. that he would be paid for changing his

21  testimony.  Thus Mr. James' statement is being offered for the truth of the matter

22  asserted.  *United States. v. Sadler*, 234 F.3d 368, 372 (8th Cir. 2000) (statement is

23  hearsay if it "would only have its desired effect if in fact the statements were true").  If

24  the government is truly offering the statement for its effect on M.S., then the testimony

25  is irrelevant to the ultimate issue in the case (whether Mr. Khalilian attempted to hire

26  M.S. to murder J.E.) or the consciousness of guilt theory of admissibility that the

27  government offered in its moving papers.

28

To put it another way, Mr. James' statements would obviously not be relevant to Mr. Khalilian's prosecution if there was no connection whatsoever between Mr. James and Mr. Khalilian.  What makes these statements potentially relevant to Mr. Khalilian's prosecution is the notion that Mr. Khalilian was offering to pay M.S. via Mr. James. Thus because the relevance is contingent upon the truth of Mr. James' statement concerning Mr. Khalilian's involvement, the statement is hearsay.  *See Ira Green, Inc. v. Military Sales & Service Co.*, 775 F.3d 12, 19 (1st Cir. 2014) ("[A]n out-of-court statement is not hearsay if it is relevant regardless of its truth.").

Finally, based on the materials presently provided in discovery, there is no connection between Mr. Khalilian and payments being offered to M.S.  The calls and recordings of Mr. Khalilian do not include a request that M.S. be paid.  And indeed some of the materials affirmatively indicate that Mr. Khalilian is not involved.  For example, on the call between Shawn Khalilian, Tyson James, and M.S., M.S. specifically asks Shawn Khalilian if Mr. Khalilian knows that Shawn Khalilian is making this call to M.S. and whether he is involved in any of these conversations, and Shawn Khalilian states that Mr. Khalilian is not involved and does not know.  Given the tenuous connection between Mr. Khalilian and these calls, the calls are vastly more prejudicial than probative and should be excluded under Federal Rule of Evidence 403.

**3.      The calls to which Mr. Khalilian is a party should be limited to exclude any reference to Mr. Khalilian's confinement.**

After discussing this matter with the Court and opposing counsel, the defense requests that the Court limit the recordings of Mr. Khalilian's telephone calls to exclude the fact that Mr. Khalilian is in jail pending trial.  The fact of Mr. Khalilian's confinement is unduly prejudicial and would suggest to the jury that Mr. Khalilian is dangerous.  For the same reasons that criminal defendants may not be tried while shackled or may opt to be tried in civilian clothing rather than jail-issued attire, the fact of Mr. Khalilian's confinement should not be revealed via the use of his recorded

telephone calls.  *Deck v. Missouri*, 544 U.S. 622 (2005); *Estelle v. Williams*, 425 U.S. 501 (1976).

**B.      Mr. Khalilian Is Constitutionally Entitled to Cross J.E. Regarding His Mental Health Condition That He Previously Described as Leading Him to Commit a Fraud**

Mr. Khalilian is entitled to cross-examine J.E. with respect to J.E.'s mental health to establish he suffers from a condition which has in the past caused him to commit a fraud. Evidence at trial will establish that J.E. was charged with three felony counts of employment disability fraud in Los Angeles Superior Court in 2018 centering on physician's reports that J.E. forged for which he received approximately $30,000 in fraudulent benefits.[2] In those reports, J.E. represented that both he and his sister suffered from "severe schizophrenia" which entitled them to employment disability.[3] In the course of litigation, J.E. filed a motion requesting that he be granted mental health diversion due to his bipolar disorder, which was denied for lack of a nexus between his mental health condition and the offense.[4] In support of a motion for reconsideration, J.E. submitted a letter on September 18, 2023, in which he stated that he was suffering from "symptoms of my illness" which led him to "feel[] mistrustful of [his psychiatrist] and that she was trying to take advantage of me and cheat me." Ex. A. J.E. wrote that he felt "entitled to the benefits I received." *Id.* Hence, put simply, J.E. felt, as a result of his bipolar disorder, that he was being persecuted by his psychiatrist and thus permitted to conduct a fraud against her.

Mr. Khalilian is constitutionally entitled to cross-examine J.E. on this point to establish that he is willing to engage in fraudulent behavior in order to retaliate against people who he feels have wronged him, including Mr. Khalilian. For that reason, Mr.

---

[2] J.E. has since pleaded guilty to misdemeanors relating to the offense.

[3] It appears that only the application in J.E.'s own name was successful, and no funds were transmitted for the sister's application.

[4] Mr. Khalilian obtained these records from the Los Angeles Superior Court docket.

Khalilian does not intend on substantively offering any mental health-related record as evidence at trial or otherwise seeking expert opinion testimony regarding J.E.'s mental health. Instead, Mr. Khalilian envisions questioning J.E. regarding J.E.'s own statements in his letter to the Los Angeles Superior Court judge and impeach him with the letter were he to contradict its contents. This approach strikes the appropriate balance by avoiding improper expert opinion testimony concerning mental health diagnoses or the general effects of various mental health conditions. Instead, Mr. Khalilian will be limited to questioning J.E. based on J.E.'s admitted conduct and how his particular mental health condition manifests in a way relevant to the defense.[5] Mr. Khalilian does not intend on dwelling on the matter, or otherwise seek to embarrass J.E. due to his mental health condition. But Mr. Khalilian should be permitted to ask some limited questions relating to the same information J.E. publicly submitted asking for leniency from state court.

Mr. Khalilian moreover is entitled to do more than cross-examine J.E. regarding his fraud convictions under Rule 609(a) because that rule serves a different purpose. While J.E.'s convictions serve to attack his credibility under Rule 609(a), his mental health condition is separately relevant because it admittedly caused him to commit a fraud. J.E. presumably continues to suffer from the same mental health condition, thereby posing the same issue. Mr. Khalilian should therefore be permitted to explore J.E.'s own description of his mental health condition as part of a defense that J.E. fabricated the murder-for-hire plot that gave rise to this prosecution.

//

//

---

[5] In discussions regarding this evidence's admissibility, the government suggested Mr. Khalilian should be required to prove as a threshold matter that J.E. was suffering some sort of acute onset of his bipolar disorder in order to admit it. The Court should reject that requirement, which has no basis in law. J.E. is free to testify, if true, that his bipolar disorder was being adequately treated in March 2023 such that he would no longer commit a fraud against someone he perceived as persecuting him. Mr. Khalilian notes, however, that J.E. was in treatment with a psychiatrist at the time of that offense, too.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  October 18, 2023          By   */s/ Jonathan C. Aminoff*

JONATHAN C. AMINOFF
ADAM OLIN
Deputy Federal Public Defender
Attorney for FEREIDOUN KHALILIAN